**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

**REGGIE WILLIAMS,**

                    **Plaintiff(s),**          **CASE NUMBER: 02-74530**
                                               **HONORABLE VICTORIA A. ROBERTS**

**v.**

**DOUG WELLS,**

                    **Defendant(s).**
_____/


**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

**I.      INTRODUCTION**

         This matter came before the Court for a non-jury trial.  The parties submitted the

following as their "Concise Joint Statement of the Case," as part of the Joint Final Pre-

Trial Order entered by the Court:

>        Plaintiff, an incarcerated prisoner in the Michigan Department of
>        Corrections System, brings this action against Doug Wells, an
>        Assistant Resident Unit Supervisor at the Gus Harrison Correctional
>        Facility.  Plaintiff asserts claims under 42 U.S.C. §1983 alleging that
>        his Eighth Amendment rights were violated when [D]efendant's
>        deliberate indifference exposed him to a substantial risk of serious
>        harm.  Specifically, [P]laintiff claims that [D]efendant failed to protect
>        him from another inmate who thereafter cut [P]laintiff across his
>        back.  Defendant has denied all material allegations made by
>        [P]laintiff and asserts that he conducted himself appropriately in light
>        of the facts presented to him.

         Plaintiff brings his claim under 42 U.S.C. §1983.  Therefore, jurisdiction is

established under 28 U.S.C. §1331.  Trial was conducted on the 13th and 14th of

December 2005.

II.     **FINDINGS OF FACT**

   *A.     BACKGROUND*

1.     In 2000, Defendant was employed by the Michigan Department of
       Corrections ("MDOC") as an Assistant Resident Unit Supervisor ("ARUS")
       at the Gus Harrison Correctional Facility ("ARF") in Adrian, Michigan.  He
       was assigned to Housing Unit 4.

2.     As an ARUS, Defendant's duties included management of the Housing
       Unit, supervision of the housing staff, and maintenance of prisoner
       treatment and case history files.  Defendant was instructed that assuring
       inmate safety was an important part of his responsibilities.

3.     Plaintiff is an inmate in the MDOC.  He is currently serving a 2 ½ to 15
       year sentence, which began in 1999.

4.     The incidents giving rise to this lawsuit began in June 2000.

5.     On June 14, 2000, Plaintiff was transferred from another MDOC facility to
       ARF.  He was placed in Housing Unit 4 under Defendant's supervision.

6.     Plaintiff met with Defendant on the day of his arrival.  He immediately
       questioned whether he was transferred to ARF in error, because ARF is a
       Level 2 facility.

7.     The Levels denote the security level of the facility; the higher the number,
       the higher the level of security.

8.     Based on the point system used by the MDOC to assess an inmate's
       security level, Plaintiff believed that he belonged in a Level 1 facility.

2

Defendant promised to look into the matter and let him know why he was transferred to ARF.[1]

### B.    PLAINTIFF'S INITIAL ENCOUNTER WITH KEVIN STEPNEY

9.    The next day, on June 15, 2000, Plaintiff was approached during yard time by another inmate who was also housed in Unit 4, Kevin Stepney.

10.   Stepney is serving a 60-90 year sentence.

11.   Plaintiff recognized Stepney as a person with whom he had an altercation fifteen years earlier, in 1985, when he and Stepney were inmates at the Wayne County Jail ("WCJ").

12.   In 1985, Plaintiff and Stepney exchanged blows following an argument. Other inmates broke up the fight without further incident. A few days later, Plaintiff was charged with sexually assaulting Stepney; a charge Plaintiff denies. The charge was later dismissed.[2]

13.   When Stepney approached Plaintiff on the yard on June 15th, he invited Plaintiff to walk around the track with him. While walking, Stepney talked to Plaintiff about what happened between them in the WCJ. Plaintiff says that Stepney's demeanor was odd; he talked about things that he would

---

[1]After reviewing Plaintiff's file, Defendant learned that Plaintiff was indeed a Level 1 prisoner. But, he was sent to a Level 2 facility because of misconduct. However, he was only to remain at Level 2 for six months, if he did not have any further problems. It is not clear when Plaintiff learned this. Defendant says that he told Plaintiff sometime after reviewing Plaintiff's file, but he did not recall exactly when.

[2]Plaintiff believes the charge was dismissed during preliminary hearings, because Stepney testified that it was dark when he was assaulted and he could not see who attacked him.

3

like to do to another inmate who was also an inmate at the WCJ, Antonio Smith.  Stepney said Smith instigated the fight between him and Plaintiff. Plaintiff says that Stepney said that he would "bust" Smith's head and stab him if given the opportunity.

14.   Although Stepney's threats were directed at Smith, Plaintiff says that he regarded Stepney's statements as veiled threats to retaliate against him for the 1985 assault.

15.   Stepney denies making any threats towards Plaintiff.  He claims that he has been a "born again" Christian since 1996.  Therefore, he said that he only approached Plaintiff to "witness" to him by suggesting that he also embrace the Christian faith.

### C.   PLAINTIFF REQUESTS ASSISTANCE FROM DEFENDANT

16.   Later on June 15th, Plaintiff went to Defendant and told him that he saw someone in Unit 4 who he "caught a case on" in the WCJ.  He did not tell Defendant that he was accused of sexually assaulting Stepney.  But, he asked Defendant to check his WCJ file, because he believed there was a Special Problem Offender Notice ("SPON") in the file regarding Stepney.

17.   A SPON is a form that is placed in an inmate's file to document potentially dangerous conflicts with other inmates.  Inmates documented as known enemies must be housed separately.

18.   Defendant asked Plaintiff if he was scared.  Plaintiff told Defendant that he did not want to be around Stepney to avoid getting into trouble.  He said that he was not sure that Stepney would do anything to him, but Plaintiff

4

asked for protective custody.

19. Per Defendant, an inmate who is placed in protective custody is "locked down" (confined to a cell) for 23 hours and takes his meals and yard time alone.

20. Defendant refused to place Plaintiff in protective custody, saying that there was not enough information.  Defendant did, however, say that he would check Plaintiff's files to confirm his claims.

21. Defendant disputes Plaintiff's account regarding protective custody.  He says that he offered Plaintiff protective custody until he could investigate, but that Plaintiff rejected the offer.  In fact, Defendant testified that Plaintiff signed a written waiver of segregation.  However, at his deposition Defendant testified that he did not recall whether Plaintiff signed a waiver.  Defendant says that he told Plaintiff that he would be transferred.

22. No signed waiver was presented at trial.

23. In the interim, Defendant offered to put Plaintiff on a list that would allow him to move to one of three other housing units in ARF--Units 1 through 3.  Housing Units 1 through 3 were on a different meal and yard schedule than Unit 4.  Therefore, a transfer to Unit 1, 2 or 3 would minimize the likelihood that Plaintiff and Stepney would interact.

24. Requests to move to another housing unit were taken in the order received.

25. Defendant says that he did not have the authority to move Plaintiff to the top of the list or to immediately transfer him.

5

26.   If it were necessary to move an inmate immediately, Defendant said that he could involuntarily segregate the prisoner and turn the matter over to his supervisor.

27.   Defendant said that he believed that Plaintiff would advance to the top of the move list within a couple of business days, because Housing Unit 4 was being cleared out anyway for conversion to a residential treatment program.

28.   Plaintiff agreed to go on the move list and signed the necessary form.

### D.   DEFENDANT'S INVESTIGATION

29.   Still later on June 15th, Defendant talked to Stepney.  However, he only asked Stepney if there was anyone in the Unit with whom he had a problem, without specifically mentioning Plaintiff.  Stepney said "no."

30.   Defendant then asked if Stepney was in the WCJ in 1985, whether he knew Plaintiff, and whether he had a confrontation with Plaintiff.  Per Defendant, Stepney answered affirmatively to all of the questions, but said that he did not have a problem with Plaintiff.

31.   Over the next few days, Defendant reviewed both Plaintiff and Stepney's incarceration files.

32.   Defendant first checked Plaintiff's "B" prefix file, which tracked his sentence which began in 1999.  It did not show Stepney as a known enemy or make reference to an altercation between Plaintiff and Stepney.

33.   Defendant then requested that the MDOC central office retrieve Plaintiff's

6

"A" prefix file from storage.  It tracked Plaintiff's first incarceration, which included his stay at the WCJ in 1985.  The "A" prefix file did not include a SPON regarding Stepney either.

34.    Defendant also retrieved Stepney's "A" and "B" files.  A SPON in Stepney's "A" file indicated that in 1985 in the WCJ, Stepney alleged that he was sexually assaulted by "Reginald" Williams and Antonio Smith.

35.    Plaintiff's legal name is "Reggie."  The MDOC prison number listed on the SPON for "Reginald" Williams did not match Plaintiff's number.[3]

36.    Defendant spoke with Plaintiff about his findings.  While Plaintiff admitted that there was an assault, Defendant says he denied that it was a sexual assault.  Plaintiff also maintained that he was the person listed in Stepney's SPON, and offered a possible explanation for the different prison number.

37.    Defendant talked to Stepney a second time.  Defendant told Stepney that, because of the discrepancy in the prison numbers, he did not believe that the Reginald Williams in the SPON and Plaintiff were the same person.  Defendant never directly asked Stepney if Plaintiff was the person who sexually assaulted him.

38.    Stepney testified that he did tell Defendant that Plaintiff was the person referenced in the SPON and that Plaintiff sexually assaulted him.

_____

[3]In fact, the number belongs to Reginald Reynolds, who uses the alias Reginald Williams.  Reynolds was also housed in the WCJ in 1985.  It is not clear, however, when Defendant confirmed this information.

7

39.    Defendant maintains, however, that at the conclusion of his investigation, he did not believe or have any evidence that Plaintiff sexually assaulted Stepney since: 1) Plaintiff denied the assault; 2) the SPON listed a different inmate; and 3) per Defendant, Stepney did not indicate that Plaintiff was his attacker.

### E.    THE MOVE LIST

40.    Plaintiff was placed on the move list the day after he first spoke with Defendant about Stepney, and Defendant says that he submitted a transfer request for Plaintiff on the same day.

41.    By June 21, 2000, Plaintiff was 23rd on the list.

42.    By June 23, 2000, Plaintiff had advanced to 10th.

43.    Sometime thereafter, however, Plaintiff's name was removed from the list, but it is not clear by whom.

44.    Per Defendant, an inmate's name could only be removed at the inmate's request, which has to be confirmed with the inmate's signature, or by the Grievance Coordinator who maintained the list.

45.    Defendant says Plaintiff told him that he removed his name from the list, because he was concerned that a move to Housing Units 1 through 3 would lessen his chances of a transfer to a Level 1 facility.

46.    Plaintiff, however, denies Defendant's assertion and says that he never asked to be removed from the list.

47.    No evidence was presented that Plaintiff signed a request to be removed from the list.

8

### F.   ESCALATING THREATS BY STEPNEY

48.   After talking to Defendant on June 15th, Plaintiff did not attend his meal times for a few days in an effort to avoid Stepney.  He only resumed eating when he got too hungry to stay away.

49.   Despite Plaintiff's efforts to avoid Stepney, he found that Stepney was always around and watching.  Stepney made direct threats which continued to escalate.  For instance, Stepney expressed anger about the alleged sexual assault in 1985.  Plaintiff says that Stepney said something to the effect, "That was some bullshit you did in 1985.  I'm not gay."  Also, while pointing at Plaintiff and talking to another, larger inmate named "Essex," Plaintiff heard Stepney say that they should "beat his ass."  Essex also made threats such as, "We ought to get you off the yard," *i.e.* harm you.

50.   Plaintiff complained to Defendant on June 16th and again on June 26th.  Also, although it is not clear exactly when, Plaintiff eventually went to Defendant's supervisor, Resident Unit Manager Ingram,[4] about the threats.  However, Ingram advised Plaintiff to give Defendant a chance to take care of it.

51.   On June 26th, Plaintiff went to Defendant's office.  He again told of threats by Stepney and requested a transfer or protective custody.

52.   In response, Defendant made reference to the fact that Plaintiff was much

---

[4]The parties did not give Ingram's full name.

9

larger than Stepney and said that Stepney would not do anything to him. Plaintiff is 6'3" or 6'4" and weighed 300 pounds.  Stepney is 5'9" or 5'10" and weighed 170 pounds.

53.   When Plaintiff persisted, Defendant gave him a direct order to leave the office.

54.   Another inmate who was standing outside waiting to see Defendant while Plaintiff was in the office corroborates Plaintiff's encounter with Defendant. Inmate George Lacy El testified that the door to Defendant's office was open.  He heard Plaintiff talking about a person with whom he had a problem and Plaintiff asked Defendant for protection.

55.   Lacy El says that Defendant denied the request for protection and ordered Plaintiff out of the office, because Defendant said that he knew that Plaintiff just wanted to get "rolled out," *i.e.,* transferred.

56.   Lacy El testified that when Plaintiff persisted, Defendant acted as though he did not have time for the conversation and again ordered Plaintiff out.

57.   After Plaintiff's conversation with Defendant on June 26th, the threats from Stepney continued.  In one instance Stepney said "I'll holler at you." Plaintiff took that to mean that Stepney would harm Plaintiff.

58.   Stepney denies having any conversations with Plaintiff after their first meeting on June 15th.

### G.   DEFENDANT'S REPORT TO THE ASSISTANT DEPUTY WARDEN

59.   Because Defendant did not have the authority to decide whether a SPON

should issue, after his investigation was complete Defendant presented his findings to the acting Assistant Deputy Warden, Carol Vallie.  He asked whether a SPON should be generated for Plaintiff and Stepney.

60.   Vallie testified that a SPON could only be issued if there was verifiable documentation that an incident occurred, and the incident was of sufficient severity to warrant a SPON.

61.   In light of Defendant's findings, Vallie found that a SPON was not warranted.  However, Defendant testified that he does not recall whether he told Vallie that he did not ask Stepney if Plaintiff was the same person referenced in the SPON.

62.   Nevertheless, Vallie testified that, without documentation to support the claim, she would have declined to issue a SPON even if she was told that Stepney identified Plaintiff as his 1985 attacker.

63.   Vallie further testified, however, that an inmate who feared for his safety and desired protection should direct the request to his ARUS.

64.   MDOC Policy Directive 04.05.120(T), which went into effect February 21, 2000, required that such requests be immediately honored pending a review by the Security Classification Committee ("SCC"):  "If a prisoner requests protection, the prisoner shall immediately be placed in temporary segregation or in a suitable temporary holding area, and a Request for Protective Segregation Agreement (CSJ-465) reviewed with the prisoner. . . . A copy of the CSJ 465 shall immediately be forwarded to the deputy warden for SCC review."

11

65.   MDOC Policy Directive 04.05.120(H) also permitted prison officials to involuntarily place an inmate in protective segregation to protect him from harm by other prisoners: "Protective segregation is a unit which provides physical separation of prisoners from the general population in order to protect them from harm by other prisoners.  A prisoner may be classified to protective segregation either voluntarily or involuntarily."

### H.   PLAINTIFF IS ATTACKED

66.   On July 3rd, Plaintiff went to Defendant again about the threats.  Defendant said that he would take care of it when he returned to work after the July 4th holiday.

67.   On July 4th, Plaintiff was attacked and stabbed.  Stepney was the attacker.

68.   While Plaintiff was in the Day Room using the microwave, Stepney came in and stood by the door.  When Plaintiff tried to walk out, Stepney swung towards his face with a weapon that he fashioned out of a toothbrush and razor blades.  When Plaintiff turned, he was cut across his back.  Stepney ran out of the room.

69.   Plaintiff immediately reported the incident to the officer stationed outside the Day Room.

70.   Plaintiff was initially reluctant to identify Stepney, for fear of being labeled a "snitch."  However, when the officer said that he could not protect Plaintiff without an identification of the perpetrator, Plaintiff told him that it was Stepney.

71.   Plaintiff was taken to health services and treated for a superficial cut.

12

72.   Stepney denied assaulting Plaintiff, but was immediately placed into segregation.

73.   A major misconduct report was prepared against Stepney.  After a hearing, he was found guilty of assault and battery.

74.   Hearing officer C. Falkenstein noted in her findings that the alleged sexual assault by Plaintiff was a strong motive for Stepney to want to exact revenge and was consistent with Plaintiff's persistent requests for a transfer: "No reason is put forth for [Williams'] fervent desire to transfer other than Williams stating he fears retaliation from [S]tepney for the assault in the count[y] jail, which seems highly reasonable to this hearing officer.  This is a strong motive to want to extract revenge."  Pl. Exh. 503.

### I.   PLAINTIFF'S DAMAGES

75.   Plaintiff's wound took three weeks to heal.

76.   A 6 to 9 inch scar remains just below Plaintiff' right shoulder blade.  It continues to cause him problems, including soreness in his shoulders, involuntary twitches and pain.  He also has difficulty exercising and his migraine headaches have become more frequent.

77.   Psychologically, Plaintiff is still apprehensive about other inmates standing behind him and about sleeping in open areas.  His fears of another attack have led to sleeplessness.  He continues to treat with mental health professionals.

## III.   CONCLUSIONS OF LAW

13

78.  42 U.S.C. § 1983 states in relevant part: "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any citizen . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress."

79.  "To state a cause of action under §1983, a plaintiff must allege the deprivation of a right secured by the United States Constitution or a federal statute by a person who was acting under color of state law." *Spadafore v Gardner*, 330 F.3d 849, 852 (6th Cir. 2003).

80.  As a government employee, Defendant was acting under color of law.

81.  Plaintiff has proved by a preponderance of evidence that Defendant was deliberately indifferent to his safety needs and, therefore, violated Plaintiff's Eighth Amendment rights.

82.  The Eighth Amendment's proscription against cruel and unusual punishment requires prison officials to "take reasonable measures to guarantee the safety of the inmates." *Farmer v Brennan,* 511 U.S. 825, 832 (1994)(citations and quotation marks omitted). "In particular, . . . 'prison officials have a duty ... to protect prisoners from violence at the hands of other prisoners.'" *Id* at 833 (*quoting Cortes-Quinones v Jimenez Nettleship*, 842 F.2d 556, 558 (1st Cir. 1988)).

83.  To establish liability under the Eighth Amendment for failure to prevent harm, an inmate must show that the prison official acted with deliberate

14

indifference to a substantial risk of serious harm.  *Id* at 834.

84.   "The concept of 'deliberate indifference' encompasses both a subjective

and an objective component."  *Curry v Scott,* 249 F.3d 493, 506 (6th Cir.

2001).

85.   "The objective component requires that the deprivation alleged be

'sufficiently serious.'" *Id.*  "Thus, 'for a claim . . . based on a failure to

prevent harm, the inmate must show that he is incarcerated under

conditions posing risk of serious harm.'" *Id* (*quoting Farmer*, 511 U.S. at

834).

86.   To satisfy the subjective component, an inmate must prove that the prison

official had a "sufficiently culpable state of mind."  *Id.*  "In prison-conditions

cases that state of mind is one of 'deliberate indifference' to inmate health

or safety. . . ."  *Farmer,* 511 U.S. at 834.

87.   Plaintiff established both components.

### A.   DEPRIVATION SUFFICIENTLY SERIOUS

88.   A threat of bodily harm is sufficiently serious to satisfy the objective

component of a deliberate indifference claim.  *Curry,* 249 F.3d at 506.

89.   Here, Plaintiff claims that multiple threats were made against him by

Stepney.  The Court find's Plaintiff's testimony credible.

90.   Therefore, Plaintiff established the first element of his claim.

### B.   SUFFICIENTLY CULPABLE STATE OF MIND

91.   "A 'sufficiently culpable state of mind' is one in which 'the official knows of

and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.'" *Curry,* 249 F.3d at 506 (*quoting Farmer*, 511 U.S. at 834).

92.   "A prison official can be liable if he 'disregards that risk by failing to take reasonable measures to abate it.'" *Id* (*quoting Farmer*, 511 U.S. at 848).

93.   Knowledge of a substantial risk may be demonstrated by direct or circumstantial evidence.  *Farmer,* 511 U.S. at 837.  "That is, a factfinder may infer actual knowledge through circumstantial evidence, or 'may conclude a prison official knew of a substantial risk from the very fact that the risk was obvious.'" *Curry,* 249 F.3d at 506 (*quoting Farmer*, 511 U.S. at 842).

94.   Plaintiff met his burden on this element.

95.   First, that Defendant had actual knowledge of a substantial risk of serious harm to Plaintiff can be inferred from Plaintiff's credible testimony that he advised Defendant of the repeated, escalating threats by Stepney and another inmate on at least four occasions prior to the attack.

96.   Moreover, Defendant uncovered overwhelming evidence that Stepney had a motive to seek retaliation against Plaintiff.

97.   Specifically, despite discrepancies in the SPON in Stepney's file, Defendant knew the following from his investigation: a) both Plaintiff and Stepney were in the WCJ in 1985; b) both Plaintiff and Stepney identified Plaintiff as the "Reginald Williams" listed in the SPON; c) although Plaintiff

16

denied that it was sexual, he admitted that he was involved in an assault on Stepney; and d) Stepney told Defendant that Plaintiff was indeed the person who sexually assaulted him.

98.   Therefore, Defendant was armed with the knowledge that Stepney, who clearly believed Plaintiff to be the person who sexually assaulted him 15 years earlier, was making repeated, escalating threats to retaliate against Plaintiff, and enlisted at least one other inmate to make threats as well.

99.   Even if the Court were to accept as true Defendant's claim that, because of the inaccuracies in the SPON, he did not believe that Plaintiff sexually assaulted Stepney in the WCJ, the Court finds that he was still made aware that Stepney and another inmate were repeatedly threatening to harm Plaintiff.

100.   Under these circumstances, the Court determines that Defendant knew that there was a substantial risk of serious harm to Plaintiff.

101.   The Court also finds that Defendant consciously disregarded the risk by failing to take reasonable steps to protect Plaintiff.

102.   As a result of Defendant's inaction, Plaintiff was injured in the very manner threatened over approximately three weeks--Stepney physically attacked him.

103.   Defendant contends that he did all that he could when he placed Plaintiff on the move list, conducted an investigation, and asked ADW Vallie whether it was appropriate to issue a SPON.

104.   However, Plaintiff offered credible testimony that he made repeated

17

requests to Defendant for protective custody.  Plaintiff made the first request on June 15th.  And, inmate George Lacy El testified that he overheard Defendant deny another request by Plaintiff as late as June 26th.

105.   Defendant's refusal to immediately honor Plaintiff's request for protective custody was directly contrary to MDOC Policy Directive 04.05.120(T).  And, even if Plaintiff actually declined protective custody as Defendant claims, Defendant had the authority to involuntarily segregate Plaintiff under subsection (H) of the MDOC Policy Directive 04.05.120, once he determined that Plaintiff was at risk.  Defendant knew by the conclusion of his investigation that Stepney posed a substantial risk of harm to Plaintiff.

106.   For these reasons, the Court finds that Plaintiff has proven by a preponderance of evidence that Defendant deprived him of his Eighth Amendment rights in violation of 42 U.S.C. §1983.

## IV.   DAMAGES

107.   Plaintiff requests compensatory and punitive damages.

108.   In §1983 actions, the amount of compensatory and punitive damages to be awarded "is left to the discretion and good judgment of the fact finder as guided by the facts of the particular case."  *Smith v Heath,* 691 F.2d 220, 226 (6th Cir. 1982).

### A.   COMPENSATORY DAMAGES

109.   "The basic purpose of a section 1983 damages award is to compensate

18

persons for injuries caused by the deprivation of their constitutional rights."
*Id.*

110. "Thus, the focal point of the inquiry must be the injury sustained and the appropriate means of addressing it." *Parrish v Johnson,* 800 F.2d 600, 608 (6th Cir. 1986).

111. There is no evidence that Plaintiff incurred economic damages, such as out-of-pocket costs for treatment of his physical or emotional injuries.

112. However, he presented evidence of compensable non-economic damages, including pain and suffering and mental and emotional distress. *See Smith*, 691 F.2d at 226-227 (recognizing that emotional distress and general pain and suffering are compensable injuries).

113. Specifically, Plaintiff endured physical pain and suffering: a) the initial wound which took three weeks to heal; b) current soreness in his shoulders, involuntary twitches and pain; and c) difficulty exercising.

114. He also suffers mental and emotional anguish that has persisted since he was stabbed: a) an apprehensiveness about other inmates standing behind him and sleeping in open areas, and b) fear of another attack, which has led to sleeplessness.

115. Where mental or emotional damages are alleged by an inmate in a §1983 claim, the Prison Litigation Reform Act, 42 U.S.C. §1997e(e),[5] requires

_____

[5]42 U.S.C. §1997e(e) states:

No Federal civil action may be brought by a prisoner confined in a jail, prison, or other correctional facility, for mental or emotional injury suffered while in custody without a

that there be a predicate physical injury that is more than *de minimis*.  *See Herman v Holiday,* 238 F.3d 660, 665 (5th Cir. 2001); *Jarriett v Wilson,* 2005 W.L. 3839415, *4 (6th Cir. 2005)(unpub. op.); *Corsetti v Tessmer*, 41 Fed. Appx. 753, 755 (6th Cir. 2002)(unpub. op.).

116.  MDOC medical records document Plaintiff's physical injury.  *See* Pl. Exhs. 505; 506 at 215.  The Court notes that an entry on July 14, 2000 suggests Plaintiff's wound healed in 10 days, rather than three weeks as he testified.  Pl. Exh. 506 at p. 215.  The records also show, however, that Plaintiff complained of pain and shaking in his arm due to the cut on his back, as well as fear and sleeplessness related to the attack.  *See* Pl. Exh. 506 at pp. 66, 67, 206.

117.  The Court is satisfied that the wound Plaintiff suffered was more than *de minimis*.

118.  Defendant offered no evidence to refute Plaintiff's claimed  damages.

119.  The Court, therefore, finds that $4,000.00 (Four Thousand Dollars) is the appropriate amount of compensatory damages.

### B.    PUNITIVE DAMAGES

120.  Punitive damages are appropriate under §1983 "when the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others."  *Smith v Wade*, 461 U.S. 30, 56 (1983).  *See also Hill v Marshall*,

---

prior showing of physical injury.

962 F.2d 1209, 1217 (6th Cir. 1992).  The Sixth Circuit "has phrased the standard for defendant's conduct to warrant punitive damages as grossly negligent, intentional, or malicious."  *Hill*, 962 F.2d at 1217.

121.   The callous indifference required for punitive damages is essentially the same as the deliberate indifference required for a finding of liability on the §1983 claim.  *Id.*

122.   Plaintiff proved that Defendant was deliberately indifferent to the threat of harm posed by Stepney.  As outlined above, more than ample evidence demonstrates that Defendant knew of the serious risk but disregarded it by failing to take reasonable steps to protect Plaintiff.

123.   Therefore, the Court awards Plaintiff punitive damages in the amount of $16,000.00 (Sixteen Thousand Dollars).

## V.   ATTORNEY FEES

124.   In 42 U.S.C. §1988, Congress provides for the award of attorney fees to prevailing parties in §1983 cases.

125.   The prevailing party should ordinarily recover an attorney fee unless special circumstances would render such an award unjust.

126.   Plaintiff prevailed in this action and is entitled to attorney's fees; no special circumstance exists which would make such an award unjust.

127.   Plaintiff is to submit a petition for attorney's fees.

## VI.   CONCLUSION

These are the Findings of Fact and Conclusions of Law.  An appropriate

21

Judgment accompanies these Findings and Conclusions.

s/Victoria A. Roberts
Victoria A. Roberts
United States District Judge

Dated:  March 29, 2006

The undersigned certifies that a copy of this document was served on the attorneys of record by electronic means or U.S. Mail on March 29, 2006.

s/Linda Vertriest
Deputy Clerk